**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Anne Bedson, | No. CV-17-03939-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Kathleen Anne Bedson ("Bedson") seeks review under 42 U.S.C. § 405(g) of the final decision of the Acting Commissioner of Social Security ("Commissioner"), which denied her application for disability benefits. For the following reasons, the Court affirms the Commissioner's decision.

Bedson is a 61-year-old female who previously worked as an accounts payable clerk and alleges she became disabled in October 2013.[1] In May 2014, she filed an application for disability benefits. (A.R. 170-71.) The claim was denied initially on November 4, 2014 (A.R. 104-07) and again upon reconsideration on April 1, 2015 (A.R. 109-111). Bedson then filed a written request for hearing on May 19, 2015. (A.R 112-113.) On January 12, 2017, she appeared and testified at a hearing at which an impartial vocational expert also appeared and testified. (A.R. 38-52.) On March 13, 2017, the ALJ issued a decision that

---

[1] In her application, Bedson initially alleged a disability onset date of September 1, 2013, but she amended the onset date to October 15, 2013 at the hearing.

Bedson was not disabled within the meaning of the Social Security Act. (A.R. 18-32.) The Appeals Council denied Bedson's request for review first on August 22, 2017 (A.R. 7-11) and then again on December 14, 2017 after considering additional information (A.R. 1-6). At that point, the ALJ's decision became the Commissioner's final decision.

## LEGAL STANDARD

The Court addresses only the issues raised by the claimant in the appeal from the ALJ's decision. *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001), *as amended on reh'g* (Aug. 9, 2001). The Court should uphold the ALJ's decision "unless it contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Id.* Put another way, "[i]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). The Court should uphold the ALJ's decision "[w]here evidence is susceptible to more than one rational interpretation," but the Court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Id.* (citations and internal quotation marks omitted).

"[H]armless error principles apply in the Social Security Act context." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). "[A]n ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination." *Id.* (citations and internal quotation marks omitted). The Court must "look at the record as a whole to determine whether the error alters the outcome of the case." *Id.* Importantly, however, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ. *Id.* at 1121.

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, and the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ

determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. pt. 404. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. At step four, the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant is capable of performing past relevant work. *Id.* § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work based on the claimant's RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled.

## BACKGROUND

At step one, the ALJ found that Bedson met the insured status requirements of the Social Security Act through March 31, 2018 and had not engaged in substantial gainful activity since October 15, 2013. (A.R. 23.) At step two, the ALJ found that Bedson had the following severe impairments: lumbar spondylosis and ulnar neuropathy. (A.R. 24.) The ALJ acknowledged that the record also contained evidence of hypothyroidism, gastroesophageal reflux disease, hypertension, and misophonia, as well as the mental impairments of anxiety, depression, and attention deficit hyperactivity disorder, but found these were not severe impairments. (*Id.*) At step three, the ALJ determined that Bedson did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (A.R. 26-27.) At step four, the ALJ found that Bedson had the RFC to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a) and was capable of performing her past relevant work as an accounts payable

clerk. (A.R. 27-32.) Therefore, the ALJ did not reach step five and concluded Bedson was not disabled. (A.R. 31-32.)

Bedson has now filed a sprawling *pro se* brief that purports to raise nineteen issues. (Doc. 21 at 2.) The Court has endeavored to give this brief a liberal construction, and it appears Bedson seeks to challenge the ALJ's decision on six grounds: (1) the ALJ erred during step two in evaluating her misophonia; (2) the ALJ did not properly weigh her symptom testimony; (3) the ALJ did not properly weigh the opinions of Physician's Assistant Stephanie Flaherty, Dr. Martin Rubin, M.D., Dr. Allen W. Rohe, Au.D., Dr. John D. Mather, Ph.D., and the state agency consultants; (4) the ALJ did not adequately develop the record; (5) the ALJ erred at step four by excluding more restrictive vocational hypotheticals from his determination and by not applying the Grids; and (6) the ALJ was biased. (Doc. 21.) The Commissioner similarly construes Bedson's brief as raising these six overarching claims of error (plus an argument concerning the appropriate scope of any remand order). (Doc. 25 at 1-2.)

As explained below, the Court concludes the ALJ's decision was supported by substantial evidence and was not based on legal error.

## ANALYSIS

I.  Whether The ALJ Improperly Classified Bedson's Misophonia As A Non-Serious Impairment During Step Two

Bedson appears to argue the ALJ erred when evaluating her misophonia during step two. (Doc. 21 at 7-8, 15.) The ALJ acknowledged that Bedson had been treated for misophonia but concluded it did not qualify as a "severe" impairment because it was "being managed medically, and the longitudinal medical record shows th[is] condition[] did not cause any ongoing functional limitations." (A.R. 24.) The ALJ further found that "no aggressive treatment was recommended or anticipated for th[is] condition[]." (*Id.*)

At step two, the ALJ considers whether the claimant has a "severe disability," 20 C.F.R. § 404.1520(a)(4)(ii), defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work

activities," *id.* § 404.1520(c). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individuals [sic] ability to work.'" *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citation omitted).

Ninth Circuit law is not a model of clarity concerning how to evaluate claims of step-two error. Some cases suggest that, although it is error for an ALJ to fail to characterize a particular impairment as "severe" during step two, the error can be disregarded as harmless if the ALJ properly addresses the impairment during later steps. *See, e.g.*, *Lewis v. Astrue*, 498 F. 3d 909, 911 (9th Cir. 2007) ("Even assuming that the ALJ erred in neglecting to list the bursitis at Step 2, any error was harmless. . . . The decision reflects that the ALJ considered any limitations posed by the bursitis at Step 4. As such, any error that the ALJ made in failing to include the bursitis at Step 2 was harmless."); *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) ("[T]he ALJ did not find that Burch's obesity was a 'severe' impairment . . . . Assuming without deciding that this omission constituted legal error, it could only have prejudiced Burch in step three (listing impairment determination) or step five (RFC) because the other steps, including this one, were resolved in her favor."). Other decisions suggest that a claimant can't complain about an ALJ's failure to identify a particular impairment as "severe" during step two so long as the ALJ determined the claimant also had other impairments that so qualify. *Buck v. Berryhill*, 869 F.3d 1040, 1048-49 (9th Cir. 2017) (citation omitted) ("Buck misunderstands the purpose of step two in the analysis. Step two is merely a threshold determination meant to screen out weak claims. It is not meant to identify the impairments that should be taken into account when determining the RFC. . . . Moreover, step two was decided in Buck's favor after both hearings. He could not possibly have been prejudiced.").

Given these difficult-to-reconcile precedents, coupled with the ALJ's determination that Bedson suffers from other conditions that do qualify as severe impairments (*i.e.,* lumbar spondylosis and left elbow ulnar neuropathy), the Court will decline to definitively resolve whether the ALJ "erred" during step two by failing to also characterize Bedson's

misophonia as a severe impairment. The key issue is whether the ALJ properly evaluated the evidence and testimony concerning her misophonia during later steps—an issue that is addressed below.

II.  Whether the ALJ Erred When Rejecting Bedson's Symptom Testimony

A.  **Legal Standard**

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (citations and internal quotation marks omitted). The ALJ found that Bedson had satisfied this first step. (A.R. 28 ["[T]he undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ."].)

If the first step is satisfied, and "there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." *Molina*, 674 F.3d at 1112 (citations and internal quotation marks omitted). Here, the ALJ did not find there was evidence of malingering, so he was required to provide specific, clear and convincing reasons to reject Bedson's testimony.

"A finding that a claimant's testimony is not credible must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (citation and quotation marks omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citation omitted); *see also Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("[T]he ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines

the testimony."). "[P]roviding a summary of medical evidence in support of a residual functional capacity finding is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible." *Brown-Hunter*, 806 F.3d at 494. Additionally, the ALJ must "elaborate on *which* daily activities conflicted with *which* part of Claimant's testimony." *Burrell*, 775 F.3d at 1138.

## B.  **Bedson's Testimony**

At the beginning of the hearing on January 12, 2017, the ALJ asked Bedson's counsel if there was "anything to add to the brief." (A.R. 41.) In response, Bedson's counsel stated that Bedson wished to add a claim that she was disabled on account of her misophonia. (A.R. 41-42.) Counsel further stated that, although this condition "was not specifically . . . mentioned . . . by name" in Bedson's brief, it was discussed in the medical records appearing at 14F and 16F. (*Id.*)

Following this clarification, Bedson testified. (A.R. 42-50.) During her direct examination, Bedson stated that she'd held "21 or 22" jobs in the previous 15 years and claimed that her misophonia was the reason why she couldn't hold a job. (A.R. 43-44.) However, when asked to provide further details on this topic, Bedson's only example was a job where her responsibilities were "tak[ing] calls from the billables" and "always talking on the phone" and she was fired "for insubordination or uncooperativeness" because she "blew up" at her employer after her request for a carpeted, partitioned office was denied. (A.R. 45-46.)

Next, Bedson was asked to describe the symptoms of her anxiety disorder. (A.R. 46.) She responded by saying they were similar to the symptoms of panic disorder. (*Id.*)

Next, Bedson was asked to describe the symptoms of her neck and back pain. (*Id.*) In response, she stated that "my SI joint causes pain when I move. It's a loose joint and if I walk around for maybe 20 minutes it starts to be very painful, I get real stiff, I can hardly even sit down after that." (*Id.*) When asked how long she can sit, Bedson stated that she can usually sit without pain when there are no people around, but if other people are present, "I get really anxious and irritated and angry and I can't control my emotions."

(*Id.*)  Bedson also stated that "I can't even stoop" and "if I bend it hurts."  (A.R. 47.)

Next, Bedson was asked to describe her daily activities.  She stated: "I have a lot of projects at my house, but I don't even want to go anywhere.  I like to stay at home and I only go out when I have to go to the doctor.  And I never go out to eat, I can't eat in a restaurant, I can't go to a movie theater, I can't go to parties."  (*Id.*)  Bedson acknowledged, however, that she can drive a car and periodically visits her daughter.  (A.R. 47-48.)  During cross-examination, Bedson was asked to describe her typical day.  (A.R. 49.)  In response, she stated that "I do a lot of computer playing games and, or watch T.V., eat.  My roommate does all the cooking . . . .  I just like to, you know, be at home alone.  I don't like to be around other people.  I have a dog."  (*Id.*)  She also stated that she can stand for 20 minutes at a time, "can sit for quite a while," and can walk for 20 minutes.  (A.R. 50.)

C.    **Analysis**

1.    Back And Neck Symptoms

The ALJ made an overall finding that Bedson's "statements concerning the intensity, persistence, and limiting effects of [her] impairments and symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (A.R. 28.)  As for Bedson's testimony concerning her "functional limitations," the ALJ explained that he was rejecting this testimony in part based upon Bedson's Function Report, in which Bedson "stated she feeds and cares for her dog, uses a computer daily to play games, check emails, and buy and sell items on Ebay, watches movies throughout the day, does light housework such as washing dishes, generally addresses her personal care needs with some minor difficulties, prepares simple meals, drives a vehicle, handles her finances, visits with family, and sews."  (A.R. 27, citing A.R. 229-37).  The ALJ stated that these "daily activities . . . are inconsistent with the claimant's allegations of disabling symptoms and limitations."  (A.R. 28.)

The ALJ also identified multiple other pieces of evidence that undermined Bedson's testimony on this topic, including (1) a medical exam from July 2014, which showed Bedson had "normal posture and a normal gait" (A.R. 28, citing A.R. 395); (2) x-rays taken

in July 2014, which revealed only "mild" issues in Bedson's lumbar spine and "no dynamic instability" and "no fractures" (A.R. 28, citing A.R. 441); (3) a medical exam from August 2014, which revealed that although Bedson had "decreased range of motion in her lumbar spine," "she was participating in physical therapy" (A.R. 28, citing A.R. 423-24); (4) a medical exam from October 2014, which revealed that a bilateral leg raise test produced a "negative" result (A.R. 28, citing A.R. 420); (5) an MRI taken in October 2014, which revealed only "mild" or "mild-to-moderate" issues (A.R. 28, citing A.R. 437-38); (6) a medical exam from February 2015 during which Bedson "indicated at times her pain was a zero on a zero-to-ten scale," "had no tenderness in her lumbar spine," "full motor strength," and "normal heel and toe walking" (A.R. 28-29, citing A.R. 465-66); (7) a different exam in February 2015, during which Bedson "reported no pain" and "had full strength in her upper extremities, full grip strength, [and] no tenderness in her elbows" (A.R. 29, citing A.R. 471-72); (8) a medical exam from March 2015 during which, although Bedson complained of some tenderness and limited range of motion, the doctor made "normal and unremarkable physical examination findings" (A.R. 29, citing A.R. 486-87); and (9) a medical exam from May 2015 in which Bedson "reported relief of her pain" from using a TENS unit and "denied that her back pain caused any numbness or gait difficulty." (A.R. 29, citing A.R. 533-34.)

The Court concludes the ALJ met its burden of identifying specific, clear and convincing reasons for rejecting Bedson's testimony concerning her neck and back symptoms. This isn't a case where the ALJ simply provided a boilerplate reason for its rejection that was devoid of specifics. To the contrary, the ALJ addressed a series of medical records, spanning a year, that tended to contradict Bedson's testimony—these records showed that Bedson consistently denied experiencing much (if any) back and neck pain and that doctors repeatedly found that Bedson didn't have any functional limitations arising from her back problems. This is a permissible basis on which to reject symptom testimony. *See, e.g.*, *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the

1    claimant's subjective testimony."); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001)

2    ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully

3    corroborated by objective medical evidence, the medical evidence is still a relevant factor

4    in determining the severity of the claimant's pain and its disabling effects."). Thus,

5    although the ALJ should have done a better job of explaining why the daily activities

6    identified in Bedson's Function Report were inconsistent with her claimed limitations,[2] any

7    error concerning the ALJ's evaluation of this particular evidence is harmless in light of the

8    sufficiency of the ALJ's overall analysis.

9                              2.   Misophonia

10   The ALJ rejected Bedson's testimony concerning her misophonia symptoms on the

11   ground that "the claimant has only self-reported numerous symptoms related to her alleged

12   mi[so]phonia to a behavior health specialist, and some of her reporting conflicts with prior

13   statements, such as having the complications since her youth and losing over 20 jobs

14   because of her symptoms in the prior year when the examination occurred in November

15   2016. . . . [W]hen she was evaluated at the psychological consultative examination in

16   October 2014, the claimant did not allege[] any problems with sound sensitivity, nor did

17   she report issues with getting along with others . . . ." (A.R. 30, citing A.R. 523.)[3]

18   The Court concludes this was a specific, clear and convincing reason for rejecting

19   Bedson's symptom testimony on this topic. Although Bedson testified at the hearing that

---

20   [2]   Although Bedson's daily activities suggest her abilities were not as limited as she
21   testified, the ALJ failed to "elaborate on *which* daily activities conflicted with *which* part
      of [her] testimony." *Burrell*, 775 F.3d at 1138. As the Ninth Circuit has noted, "ALJs
22   must be especially cautious in concluding that daily activities are inconsistent with
      testimony about pain, because impairments that would unquestionably preclude work and
      all the pressures of a workplace environment will often be consistent with doing more than
23   merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014).

24   [3]   This discussion appears in the portion of the ALJ's opinion addressing how much
25   weight to afford to various medical opinions. The better practice would have been for the
      ALJ to provide this discussion in the earlier portion of the opinion addressing Bedson's
      testimony. Nevertheless, fairly read, this discussion is clearly an attempt to evaluate
26   Bedson's misophonia symptom testimony. *Cf. Molina*, 674 F.3d at 1121 (citations and
      internal quotation marks omitted) ("[W]here the ALJ rejects a witness's testimony without
27   providing germane reasons, but has already provided germane reasons for rejecting similar
      testimony, we cannot reverse the agency merely because the ALJ did not clearly link his
28   determination to those reasons. Even when an agency explains its decision with less than
      ideal clarity, we must uphold it if the agency's path may reasonably be discerned.").

her extreme sensitivity to sound was a long-running, disabling condition that was the reason she hadn't been able to hold a steady job over the last 15 years, Bedson didn't make any mention of this condition or its symptoms when being examined by a psychological examiner in 2014. It was permissible for the ALJ to reject Bedson's testimony on this basis. *Cf. Dunn v. Astrue*, 2009 WL 1844347, *7-8 (C.D. Cal. 2009) (affirming ALJ's rejection of claimant's symptom testimony, where claimant testified at the hearing she "cried daily" yet "never told [her doctor] she cried daily").[4] Furthermore, although Bedson has identified several reasons in her brief to this Court why her failure to mention this condition during prior doctor visits shouldn't be viewed as a sign of recent fabrication,[5] the ALJ's interpretation of the evidence was rational and the Court must uphold the ALJ's decision where the evidence is subject to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679-81 (9th Cir. 2005).

III.    Whether The ALJ Erred When Evaluating The Opinion Evidence

Bedson seems to be challenging the weight afforded to the opinions in the record. (Doc. 21 at 5-11, 13-16, 19.) The ALJ gave "no weight" to the opinions of Physician's Assistant Stephanie Flaherty, Dr. Martin Rubin, and Dr. Allen Rohe, "partial weight" to the state agency consultants' opinions regarding Bedson's physical conditions, and "great weight" to non-treating, examining physician Dr. John D. Mather's opinion and to the state agency consultants' opinions regarding her "panic disorder." For the reasons that follow, the Court finds that the ALJ did not commit reversible error.

---

[4]    The Court notes that the ALJ's opinion does contain one factual error concerning Bedson's misophonia. The ALJ apparently misinterpreted Bedson's testimony as a claim that she'd held 20 different jobs in the year 2016 and concluded this claim was inconsistent with Bedson's testimony that she'd stopped working in October 2013. (A.R. 30.) As Bedson correctly notes in her reply brief to this Court (Doc. 29 at 1), this was an error—Bedson was referring to the 20 or 21 jobs she'd held over the course of her career. Nevertheless, the Court concludes this error was harmless in light of the ALJ's separate finding that Bedson's testimony was not credible in light of her failure to mention her alleged sound sensitivity during prior doctor visits.

[5]    Specifically, Bedson seeks to excuse her failure to mention this condition during earlier doctor visits because (1) she was overcome by "[f]eelings of embarrassment" about the condition and feared her doctors would think she was "crazy" or "overly sensitive" (Doc. 21 at 7-8) and (2) she wasn't aware her condition had a specific name until it was diagnosed by Dr. Rohe in 2016 (Doc. 21 at 6-7).

A.  **Martin Rubin, M.D.**

"The medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Garrison*, 759 F.3d at 1012 (citation omitted). "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Id.* (citation omitted).

On November 11, 2009, Dr. Rubin wrote a note stating: "Kathleen Bedson is suffering from a medical condition that, at times, could affect her work performance. I have recommended that she not work on days when her symptoms are severe, and have referred her to a specialist for further evaluation." (A.R. 548.) The ALJ gave this opinion "no weight" for three reasons: (1) it was "vague and fail[ed] to indicate any specific limitations resulting from the claimant's impairments"; (2) it was "inconsistent with the record as a whole, which shows that the claimant was able to manage her lumbar spondylosis and left elbow neuropathy with conservative medical treatment and generally had normal physical examination findings other than some lumbar tenderness and limited range of motion"; and (3) Dr. Rubin's "opinion that the claimant was unable to work is a determination reserved for the Commissioner of the Social Security Administration, and therefore, such opinion is given no weight as only the Commissioner can make such a determination." (A.R. 30.)

Even if an ALJ does not expressly find that a treating physician's opinion is contradicted by other medical opinions, the Court may infer this contradiction from the record. *Trevizo*, 871 F.3d at 676. Here, the ALJ did not expressly note any contradiction, but the Court finds that Dr. Rubin's opinion was contradicted by the state agency consultant

opinions, which concluded that Bedson's impairments were not disabling. (A.R. 66, 70, 83, 86.) Thus, the ALJ could reject Dr. Rubin's opinion by providing specific and legitimate reasons supported by substantial evidence.

The ALJ did so here. The vagueness of Dr. Rubin's opinion and Dr. Rubin's failure to indicate any specific limitations resulting from Bedson's impairments each constituted a specific and legitimate reason to reject his opinion. As the Ninth Circuit has noted, "an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (citations omitted). Dr. Rubin used only the vague term "medical condition" and failed to specify what condition was "affect[ing] her work performance." (*See* A.R. 548.) He then noted that Bedson should not work on days when her symptoms were severe (*see id.*), but he failed to identify those symptoms or identify the type of specialist to which he was referring her.

The inconsistency with the medical record was also a specific and legitimate reason to reject Dr. Rubin's opinion. The documents cited by the ALJ show that Bedson's gait and posture were normal (A.R. 395), her back problems were mostly mild and not debilitating (A.R. 437-38, 465-66, 486-87 533-34) and being treated (A.R. 465-66, 486-87), she had mostly normal sensory examination findings (A.R. 493), and she was responding well to some spondylosis treatment (A.R. 533-34).

## B.    **Allen W. Rohe, Au.D.**

In a letter, Dr. Rohe stated that Bedson "ha[d] been diagnosed with Misophonia," described the condition, and further noted that until her symptoms could be clinically managed, she would require accommodations, including some type of white noise generator, ear plugs, and a private office space. (A.R. 496.)

The ALJ gave this opinion "[n]o weight" because "there [was] no support for such limitations in the record." (A.R. 30.) Specifically, the ALJ found that Bedson's self-reports to a behavioral therapist were the only evidence of her specific symptoms in the record and that she had made statements to the behavioral therapist that were inconsistent

with the record. (*Id.*) Further, the ALJ noted that "when she was evaluated at the psychological consultative examination in October 2014, [she] did not allege any problems with sound sensitivity, nor did she report issues with getting along with others as she alleged to her behavioral therapist." (*Id.*)

The Court finds that Dr. Rohe's opinion was contradicted by the state agency consultant opinions, which concluded that Bedson's impairments were not disabling (A.R. 70, 86), and by Dr. Mather's opinion, which did not mention a diagnosis of misophonia and concluded that "[i]n her presenting state there do not appear to be psychiatric/psychological conditions precluding her functioning within the cognitive, social or daily living domains" (A.R. 414). Thus, the ALJ could reject Dr. Rohe's opinion by providing specific and legitimate reasons supported by substantial evidence.

The lack of support for the limitations to which Dr. Rohe opined is a specific and legitimate reason to reject his opinion. As with Dr. Rubin's opinion, this opinion was "conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings." *Batson*, 359 F.3d at 1195. The ALJ found that the only evidence in the record of Bedson's misophonia symptoms was Bedson's self-reports to a behavioral therapist (A.R. 30, citing A.R. 513-20). Although, as Bedson indicates in her brief (Doc. 21 at 6), there was another set of treatment notes from a different provider in the record mentioning misophonia, these treatment notes only state that Bedson "was recently diagnosed by her audiologist with misophonia" (A.R. 498), which does not provide any additional support for Dr. Rohe's findings. There were no treatment notes from Dr. Rohe in the record, and even the self-reports to the behavioral therapist did not contain any objective findings regarding Bedson's alleged misophonia symptoms. Moreover, the fact that Bedson did not allege any problems with sound sensitivity and did not report issues with getting along with others to Dr. Mather further supports the conclusion that Dr. Rohe's opinion was unsupported by the record.

C.    **John D. Mather, Ph.D.**

Dr. Mather, who examined Bedson in October 2014, noted in his report that

"[p]resently there do not appear to be significant psychological/psychiatric manifestations that would prevent Ms. Bedson from performing functionally across the neurocognitive, daily living or social domains."  (A.R. 411; *see also* A.R. 414 ["In her presenting state there do not appear to be psychiatric/psychological conditions precluding her functioning within the cognitive, social or daily living domains."].)  He diagnosed her only with "Unspecified Depressive Disorder" and "Unspecified Anxiety Disorder."  (AR. 414.)  In his report, he did not mention Bedson describing any symptoms of misophonia and did not diagnose her with misophonia.

In general, the opinions of treating physicians are given more weight than those of non-treating physicians.  *See* 20 C.F.R. § 404.1527(c)(2).  Nevertheless, the fact the physician examined the claimant is a relevant consideration in weighing the opinion.  *Id.* § 404.1527(c)(1).  Moreover, the Ninth Circuit has suggested that where the Commissioner retains a physician for a consultative examination, if that physician conducts his own objective clinical tests and makes his own findings, that physician's opinion constitutes substantial evidence.  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

Here, in giving Dr. Mather's opinion "great weight," the ALJ found his opinion was "consistent with his objective findings and the record as a whole, which showed the claimant had normal and unremarkable mental status findings, combined with her own statement that she had not had any mental health treatment for the prior 10 years, suggesting her mental impairments were well-controlled."  (A.R. 25-26.)

Dr. Mather's findings were indeed consistent with the record and specifically with the documents the ALJ cited.  Although "normal and unremarkable" might not have been the best description, the records the ALJ cited showed that Bedson had normal neurological exam findings in connection with testing for her back problems and was diagnosed by other providers with anxiety disorder and depressive disorder.  (A.R. 396, 465, 471, 499, 533).  Further, no provider had recommended any aggressive treatment for her mental conditions, and no objective medical records indicated that her mental conditions were debilitating—she was only prescribed medications and told to practice healthy coping skills and seek

counseling and peer support services.  (A.R. 396, 499, 523.)[6]

Additionally, Dr. Mather's opinion was based on his own clinical testing and findings.  And, as the ALJ noted, his opinion was consistent with his findings that Bedson's "perceptual, language, memory, and sensorimotor functioning appear to be within average limits."  (A.R. 413.)

Accordingly, because Dr. Mather's opinion was consistent with the record, and he made his own clinical findings, the ALJ did not err in giving the opinion great weight and relying on it to reject the opinion of Dr. Rohe.

D.    **State Agency Consultants**

"Although the contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

The ALJ gave "great weight" to the state psychological consultants' finding that Bedson's "panic disorder" was a non-severe impairment because this finding was "consistent with the record as a whole and Dr. Mather's opinion and findings, which show[ed] that the claimant had normal and unremarkable mental status findings during several different examinations."  (A.R. 26, citing A.R. 64, 84.)  Because the ALJ only referred to the consultants' findings regarding "panic disorder," this could not have been a legitimate reason to reject Dr. Rohe's opinion regarding Bedson's misophonia.  Moreover, the state psychological consultants did not actually refer in their listing of impairments to a "panic disorder."  (A.R. 64, 84.)  But, to the extent there was any error here, it was harmless because, as noted above, the ALJ offered specific and legitimate reasons

---

[6]    The ALJ also gave "great weight" to Dr. Mather's opinion in part because "Bedson reported she has not worked with anyone in a mental health capacity for the last 10 years" (A.R. 410), which the ALJ contended "suggest[ed] her mental impairments were well-controlled."  (A.R. 26.)  Yet one of the documents the ALJ cited in support of this conclusion was the Mountain Health and Wellness behavioral health assessment, in which Bedson complained of anxiety, depression, and social phobia.  (A.R. 387-405.)  That document is from July 2014, only three months before Dr. Mather's examination.  Nevertheless, any error was harmless because the other documents the ALJ cited show that Bedson's mental conditions were being addressed.

unrelated to the state psychological consultants' findings for rejecting Dr. Rohe's opinion.

The ALJ gave "partial weight" to the findings regarding Bedson's physical conditions. (A.R. 29.) The consultant at the initial level found that Bedson did not have any severe physical impairments (A.R. 84), but the consultant upon reexamination found that her spine disorder and peripheral neuropathy were severe (A.R. 64). Also upon reexamination, the state consultants found that Bedson's claimed exertional limitations were not supported by the medical record, although the consultants acknowledged that Bedson did have some exertional and manipulative limitations. (A.R. 65-67.) The ALJ noted that the record showed Bedson's impairments caused physical limitations, consistent with the reexamination findings, but there was no support for the findings that her impairments caused postural or manipulative limitations. (A.R. 29.)

Specifically, the ALJ noted that Bedson "only had some loss of sensation at very few examinations, but otherwise had normal sensory examination findings and had conservative treatment of her left elbow neuropathy," and "was able to treat her lumbar spondylosis conservatively as well, with physical therapy, a TENS unit, and an SI belt, and other than some slight tenderness and mild limited range of motion in her lumbar spine, [she] otherwise had normal physical examination findings." (*Id.*) The documents cited by the ALJ in support show that her gait and posture were normal (A.R. 395), her back problems were mostly mild and not debilitating (A.R. 437-38, 465-66, 486-87) and being treated (A.R. 465-66, 486-87), she had mostly normal sensory examination findings (A.R. 493), and she was responding well to some spondylosis treatment (A.R. 533-34.) Thus, the ALJ's treatment of the state agency consultants' physical findings is consistent with the record.

### E.    **Stephanie Flaherty, P.A.**

P.A. Flaherty found that Bedson could only stand thirty to sixty minutes in an eight-hour workday, could only sit for four hours in an eight-hour workday, could not lift more than 10 pounds, could not twist, stoop, crouch, or climb ladders or stairs, was "incapable of even 'low stress' jobs," and would miss more than four days of work each month due to

her impairments. (A.R. 381-83.)

A physician's assistant was not considered an "acceptable medical source" at the time Bedson filed her claim. *See* 20 C.F.R. § 404.1502(a)(8).[7] An ALJ may disregard evidence from a source that is not an "acceptable medical source" if the ALJ provides "germane reasons" for doing so. *Molina*, 674 F.3d at 1111. The ALJ provided germane reasons here.

The ALJ rejected P.A. Flaherty's opinion because he found it was inconsistent with the medical record as a whole. (A.R. 30.) Relying on several pieces of evidence, the ALJ found that Bedson was "able to manage her lumbar spondylosis and left elbow neuropathy with conservative medical treatment" and "generally had normal physical examination findings other than some lumbar tenderness and limited range of motion." (*Id.*). As described above, the records the ALJ cited supported his conclusion. (*See, e.g.*, A.R. 420, 437-38, 441, 465-66, 533-34.) The ALJ also noted that the record "show[ed] numerous normal mental status examinations." (A.R. 30.) Specifically, P.A. Flaherty's opinion contradicted that of Dr. Mather, who found that Bedson's psychological and psychiatric impairments did not prevent her from working. Additionally, as noted above, other records

---

[7]     It is unclear whether a physician's assistant working with a doctor can be considered an "acceptable medical source." In *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996), the Ninth Circuit found that where a nurse practitioner "worked closely under the supervision of [the doctor] and she was acting as an agent of [the doctor] in her relationship with [the claimant]," her opinion should have been considered as part of the opinion of the doctor, an acceptable medical source. The court concluded that "a nurse practitioner working in conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner working on his or her own does not." *Id.* Although this holding has been applied in the context of weighing the opinions of physician's assistants as well as nurse practitioners, its continuing validity is unclear because the portion of the regulation on which the *Gomez* court relied has since been amended. *See, e.g.*, *Vega v. Colvin*, 2015 WL 7769663, *13 (S.D. Cal. 2015), *report and recommendation adopted*, 2015 WL 7779266 (S.D. Cal. 2015) ("[A]s numerous district courts in the Ninth Circuit have recognized, . . . the regulation relied on in *Gomez* regarding 'interdisciplinary teams' involving 'other sources' such as nurse practitioners and physician assistants has since been amended, and 'interdisciplinary teams' are no longer considered 'acceptable medical sources.'") Regardless, there is insufficient evidence here to conclude that P.A. Flaherty was working closely under the supervision of Dr. Labban or as an agent of Dr. Labban. Although both of their names are listed next to the signature line, and Bedson seeks to attribute P.A. Flaherty's opinion to Dr. Labban (Doc. 21 at 5), the document appears to have been filled out by P.A. Flaherty and it is unclear who signed it (*see* A.R. 383).

cited by the ALJ showed that Bedson had normal neurological exam findings in connection with testing for her back problems, had not been prescribed any aggressive treatment to address her mental conditions, and was not left debilitated by any mental condition. (A.R. 396, 465, 471, 499, 523, 533). Accordingly, the inconsistency with the medical record and with Dr. Mather's opinion was a germane reason to reject P.A. Flaherty's opinion.

## IV.   Whether the ALJ Adequately Developed the Record

### A.   **Underlying Facts**

At the outset of the hearing on January 12, 2017, the ALJ noted that Bedson's counsel wished to add some new documents to the record. (A.R. 40.) Specifically, the ALJ explained that although the initial version of the record encompassed the "documents marked as 1A through 18F," Bedson's counsel had provided four additional documents on the morning of the hearing: (1) a document from "Lifewell," which would be marked as document 19F, (2) a "prescription note from Dr. Ruben [sic]," which would be marked as document 20F, (3) a "performance discussion record" from "Drive Time," which would be marked as document 21F, and (4) a "development plan[]" from "Drive Time," which would be marked as document 22F. (A.R. 40-41.) The ALJ accepted this request, and the transcript includes the following notation: "Exhibits 1A through 22F, previously identified, were received into evidence and made part of the record thereof." (A.R. 41.) The ALJ also indicated that unspecified "electronically submitted" exhibits would "be marked in the exhibits *as well*." (*Id.*, emphasis added.) The record, however, only contains exhibits 1A through 20F.

### B.   **Analysis**

Bedson appears to be arguing that the ALJ failed to adequately develop the record. (Doc. 21 at 8.) She contends she "was unable to locate and present the medical evidence by a Misophonia Specialist until January 7, 2016 because the newly diagnosed condition was unnamed." (*Id.*)

"An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the

evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).

Bedson did not report any misophonia symptoms to Dr. Mather at her examination in 2014. This omission can't be excused by the fact that Bedson didn't know the *name* of the condition at the time, as the *symptoms* of the condition (which Bedson now claims were debilitating and caused her to repeatedly lose jobs over 15-year period) still would have been present. Moreover, the medical records that discussed her misophonia indicated the condition could be treated and managed. Thus, the record was not inadequate to allow the ALJ to properly evaluate Bedson's misophonia condition and the ALJ did not have a duty to further develop the record.

Relatedly, in her reply, Bedson claims that records she sought to introduce into evidence at her hearing regarding her misophonia never made it into the administrative record. (*See* Doc. 29 at 8 ["Electronically submitted exhibits were not entered into the Record (Tr. p. 41) as the ALJ stated that they would be at the hearing."].) She contends the documents she moved to add to the record on May 1, 2018 were the same exhibits that should have been added to the record at the hearing. (*See id.* at 2; Doc. 20 at 2.) These records include, among other documents, forms that Bedson provided to Dr. Rohe regarding her misophonia symptoms, progress notes from Dr. Rohe, and letters from friends and family members detailing the manifestation of her misophonia symptoms.

Under the Social Security Act, "[t]he court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). "To be material under section 405(g), the new evidence must bear 'directly and substantially on the matter in dispute.'" *Mayes*, 276 F.3d at 462 (citation omitted). The claimant "must additionally demonstrate that there is a 'reasonable possibility' that the new evidence would have changed the outcome of the administrative hearing." *Id.*

Here, even assuming these documents should have been added to the administrative record at the time of the hearing, any error in failing to add them was harmless. These

1   documents would not have provided any objective support for Bedson's misophonia, as
2   they mostly consist of additional self-reporting of her symptoms and non-objective letters
3   from friends and family members.  Because Bedson has failed to show there is a reasonable
4   possibility this evidence would have changed the outcome of the hearing, the Court
5   declines to remand for Bedson to add these documents to the record.

6   V.      Whether The ALJ Erred At Step Four By Excluding More Restrictive Vocational
        Hypotheticals From His Determination And By Not Applying The Grids
7

8           Bedson argues the ALJ erred in not considering the other hypotheticals from the
9   vocational expert's testimony.  (Doc. 21 at 15, 23.)  The vocational expert first testified
10  that a hypothetical individual of the same age, education, and work experience as Bedson,
11  with a sedentary exertional level, could perform Bedson's past work as an accounts payable
12  clerk. (A.R. 51.)  Next, in response to the ALJ's questioning, the vocational expert testified
13  that a person who misses two or more days per month or who is off-task at least ten percent
14  of the time would be unable to maintain employment.  (*Id.*)

15          "An ALJ is free to accept or reject restrictions in a hypothetical question that are not
16  supported by substantial evidence."  *Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir.
17  2001); *see also Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (quoting *Sample
18  v. Schweiker*, 694 F.2d 639, 644 (9th Cir. 1982)) ("The testimony of a vocational expert 'is
19  valuable only to the extent that it is supported by medical evidence.'").  Here, although the
20  vocational expert testified that a person who misses two more days per month as well as
21  one who is off-task at least ten percent of the time would not be able to maintain
22  employment (A.R. 51), there was not substantial evidence that Bedson was subject to those
23  restrictions.  Although P.A. Flaherty opined that Bedson would miss four or more days per
24  month (A.R. 383), the ALJ provided germane reasons for disregarding that opinion.
25  Similarly, although Dr. Rubin's opinion suggested Bedson might miss multiple days of
26  work per month, the ALJ also properly rejected that opinion.  The remaining evidence in
27  the record did not show that Bedson would miss at least two days of work per month, and
28  there was no evidence whatsoever showing she would be off-task at least ten percent of the

time.  Thus, the ALJ did not err in declining to consider this hypothetical.

Bedson also argues the ALJ erred in not applying the medical-vocational guidelines (the "Grids") to her claim.  (Doc. 21 at 25.)  However, an ALJ is only required to apply the Grids if he determines the claimant cannot perform past relevant work.  *Crane v. Shalala*, 76 F.3d 251, 255 (9th Cir. 1996) ("The determination that Crane could perform his past relevant work also negates his argument that the ALJ erred in the application of the medical-vocational guidelines."); 20 C.F.R. Pt. 404, Subpt. P, App. 2 ("The following rules reflect the major functional and vocational patterns which are encountered in cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevents the performance of his or her vocationally relevant past work.").

## VI.    Whether The ALJ Was Biased

Bedson argues the ALJ did not fairly adjudicate her claim.  (Doc. 21 at 23.)  To the extent she is asserting that "the ALJ did not impartially assess the evidence," she would need to "show that the ALJ's behavior, in the context of the whole case, was so extreme as to display clear inability to render fair judgment."  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214-15 (9th 2005) (citations and quotation marks omitted).  The Court "must begin with a presumption that the ALJ was unbiased."  *Id.* at 1215.  To rebut this presumption, Bedson must "show[] a conflict of interest or some other specific reason for disqualification."  *Id.* (citation and internal quotation marks omitted).

Bedson has not shown a conflict of interest or any other specific reason for disqualification.  The ALJ prepared a reasoned opinion in which he examined Bedson's medical history and considered the evidence presented.  Bedson's disagreement with his conclusions and weighing of the evidence doesn't make him biased.

…

…

…

Accordingly, **IT IS ORDERED** that the final decision of the Commissioner of Social Security is **affirmed**. The Clerk shall enter judgment accordingly and **terminate** this case.

Dated this 13th day of March, 2019.

_____
Dominic W. Lanza
United States District Judge